## Case No. 11,160.

### PIERSON et al. v. OGDEN.

[31 Hunt, Mer. Mag. 328; 2 Liv. Law Mag. 703.]

District Court, S. D. New York. 1854.[1]

SHIPPING—CHARTER PARTY—DEMURRAGE—BEGINNING OF LAY DAYS—FOREIGN CUSTOMS LAWS.

[A shipmaster cannot report himself "ready to receive cargo" before he is permitted by the revenue laws of the port to receive it.]

[This was a libel by Jonathan Pierson and others against David Ogden for breach of charter party.]

Mr. Donohue and Mr. Parsons, for libelant. Mr. Owen, for respondent.

INGERSOLL, District Judge. On the 28th of April, 1851, the respondent chartered the ship Hemisphere, then in this port, of the libelants, her owners, for a voyage from Liverpool to the port of New York. By the charter party it was agreed that the ship should receive on board at Liverpool a full cargo of general merchandise, and not exceeding 513 passengers, and that the ship should not be obliged to take on board an amount of iron exceeding her registered tonnage. The respondent was to provide water, provisions, and berths, and all other expenses connected with the passengers, and to pay hospital and commutation fees in New York, and quarantine expenses. If the ship provided berths, the respondent was to pay the usual price for them, and he was to buy the passenger stores then on board at their value in Liverpool. The lay days for loading at Liverpool were to be as follows: "Commencing from the time the captain reports himself ready to receive cargo, fifteen running lay days; and for each and every day's detention, by default of the respondent or agent, one hundred silver dollars per day to be paid by respondent." The libelants now sue to recover the charter money, which was agreed upon at £1,500, the value of the passengers' stores on board, and seven days' demurrage at Liverpool. The respondent denies that they are entitled to demurrage, and objects to paying the charter money, on the ground that the ship did not bring a full cargo.

By the act of 3 & 4 Wm. IV. c. 52, entitled "An act for the general regulation of the customs," it is provided, among other things, that no goods shall be shipped, or waterborne to be shipped, on board any ship in any port or place in the United Kingdom, to be carried beyond seas, before due entry outwards of such ship, and due entry of such goods, shall be made and cocket granted, nor before such goods shall be duly cleared for shipment, in manner therein directed, under pain of forfeiture. It is also provided that, before any goods be taken on board any outwardbound ship, the master shall deliver to the collector or controller a certificate from the proper officer of the clearance inwards of such ship on her last voyage, and also an account signed by the master or his agent, of the entry outwards of such ship for the outward voyage, etc. If, however, it becomes necessary to lade any heavy goods before the whole of the inward cargo is discharged, in order to stiffen or ballast the ship, it is lawful for the collector or controller to issue to the master what is called a "stiffening note," being a permit to receive such goods for that purpose. After the whole of the inward cargo is discharged, the collector issues to the master what is called a "jerk note," being a permit which authorizes him to receive on board goods for his outward cargo.

The Hemisphere set sail from this port soon after the execution of the charter party. She arrived at Liverpool in June, and soon after commenced discharging. On the 24th of June, having discharged a part of her cargo, her master obtained from the collector a "stiffening note," authorizing him to receive on board railroad iron only. On the 28th of June all her cargo was discharged, but the "jerk note," authorizing him to receive his outward cargo, was not obtained till the 30th. Some railroad iron was furnished previous to this, and before July 15th the whole cargo was furnished, consisting of railroad and other iron, crates, boxes of dry goods, etc., making up a cargo of general merchandise. The captain, on the 23d day of June, reported to the agent of the respondent that he was ready to receive cargo.

The libelants allege that the lay days commenced on the receipt of the "stiffening note," on the 24th of June, which would give them seven days' demurrage; while the respondent claims that they did not commence until the receipt of the "jerk note," on the 30th, in which case they would be entitled to no demurrage. The expression in the charter party is, that the lay days commenced "from the time the master reports himself ready to receive cargo." They do not commence, however, until he has a right to report himself ready, and he has no such right until the ship is actually ready; and she is not ready as long as she is prohibited by law from receiving cargo, in consequence of the nonperformance of certain things to be done on her part, and there can be no delay on the part of the charterer until she has been so made ready. The construction of that part of the charter party relating to lay days is that the charterer shall have the right to detain the ship, in order to put on board a cargo of general merchandise, fifteen days after she shall have been placed at his disposal, and not detained on business of the owner or prior charterer, and after she shall have been put in such a condition that he can put on board such a cargo. She was not detained by the charterer before June 30th, but by the owner for the purpose of discharging her inward cargo. Till that time no goods could have

been put on board of her except railroad iron. The respondent was not bound to put any railroad,or other iron on board under the charter party. He could [not]² put on board a cargo of general merchandise without putting on board any iron. Till the 30th of June, then, she was not ready to receive a cargo of general merchandise, and the lay days do not commence till that time. This also agrees with the custom of the port of Liverpool, as shown by the weight of the evidence in the cause.

No delay was occasioned to the ship in consequence of the passengers. The weight of testimony is that she was fully and properly loaded, and the respondent has no ground for claiming that she did not bring a full cargo. Nor has he any ground of complaint as to the number of passengers. The charter party did not require that 513 passengers should be brought at all events. A portion of the cargo was so placed between decks that so many could not have been brought without violating the act of congress on that subject. Only 350 berths were provided by the ship, and none by the charterer; and only 350 passengers were tendered to the ship, and these she brought. The agent of the respondent did not claim that more berths should be furnished, and thereby assented that no more passengers should be brought.

The respondent is also, by the terms of the charter party, liable for the hospital and commutation fees in New York, for quarantine expenses, and for the passenger stores furnished by the libelant.

Decree, therefore, that the libelants recover the charter money, less what they have been paid, besides the hospital money, etc., and the price of the stores, and reference to a commissioner to ascertain the amount.

[NOTE. On appeal to the circuit court the decree of this court was modified by deducting from the freight the sum of $1,200, for damages sustained on account of the noncompliance with the charter party. Case No. 10,781. This decree was affirmed by the supreme court, where it was taken on appeal. 23 How. (64 U. S.) 167.]

---

PIERSON v. RICHARDSON. See Case No. 13,743.

PIGNEL (UNITED STATES v.). See Case No. 16,049.

